IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LISA MILLER                          :

                                 :

    v.                          :   Civil Action No. DKC 2006-1176

                                 :

SYBASE, INC.                         :

                                 :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is the motion of Defendant Sybase, Inc. for summary judgment pursuant to Fed.R.Civ.P. 56. (Paper 6). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motion for summary judgment will be granted.

**I.   Background**

The following facts are either undisputed or construed in the light most favorable to Plaintiff Lisa Miller. Plaintiff claims Defendant terminated her employment because of her race, African American, and in retaliation for engaging in protected activity. (Paper 1).

Defendant sells software systems to the public and private sectors. Plaintiff began her employment with Defendant on January 29, 1996 as an information technology consultant in its public sector division. In 1998 Plaintiff filed a charge of race discrimination against Defendant with the Montgomery County Human

Relations Commission.   That charge of discrimination was finally adjudicated in April 2003 in favor of Defendant.  (Paper 6, Ex. A, Miller Dep., at 16).

Michael Reynolds, Director of Professional Services, explained the role of consultants, such as Plaintiff.

> Sybase's consultants only generate revenue for the Company when they are assigned to billable projects, meaning a client is being billed for the consultant's services.   When a client project ends, Sybase makes every effort to immediately place any affected consultants in another billable project.   If, however, no billable assignment is available, the consultant is placed "on the bench" (an industry term for consultants waiting to be assigned to a project and therefore not producing revenue).   Consultants are paid their regular salary even while they are on the bench.  For that reason, Sybase strives to have its consultants on the bench for as little time as possible, because the Company must continue to pay a consultant even though he or she is not producing revenue.

(Paper 6, Att. F, Reynolds Decl. ¶ 2).  The public sector division, where Plaintiff worked, tracked the productivity of its consultants by calculating "utilization rates."   (*Id.* ¶ 3).   Defendant calculated utilization rates "by taking a consultant's total number of billable hours per quarter divided by [Defendant's] target of 450 billable hours per quarter."   (*Id.*).   Defendant used utilization rates to determine "whether a consultant has been producing revenue via billable hours to cover his or her continued salary and benefits." (*Id.*).

Most of Defendant's government clients require consultants to obtain certain security clearances. (Paper 6, Att. F, Reynolds Decl. ¶ 4; *id.* Ex. A, Miller Dep., at 27). The progressively more rigorous levels of government security clearance are: Confidential, Secret, Top Secret, and Sensitive Compartmented Information ("SCI"). (Paper 6, Att. F, Reynolds Decl. ¶ 4). Consultants with higher security clearances are more marketable to government clients. (Paper 6, Ex. A, Miller Dep., at 26-27). In July 2003, Defendant requested a Top Secret-SCI clearance for Plaintiff from the Defense Intelligence Agency ("DIA"). (Paper 6, Ex. C, Andrews Dep., at 8-9). Adjudication of a clearance application by DIA may take from "six months to years[.]" (*Id.* at 10).

In April 2004, the project to which Plaintiff had been assigned at the United States Department of Agriculture ended and she was placed "on the bench." In May 2004, Plaintiff interviewed for a position at the Office of Naval Intelligence. This position required a Top Secret-SCI clearance. Plaintiff's clearance application with DIA was still pending as of June 2004.[1]

While on the bench, Plaintiff reported to Jody Kao, the resource manager. As the resource manager, Kao's job was to find billable assignments for consultants on the bench. On June 11, 2004, Kao offered Plaintiff an opportunity to work on a billable

---

[1] Plaintiff's security clearance was ultimately approved on August 25, 2004. (Paper 6, Ex. A, Miller Dep., at 116).

healthcare assignment.  (Paper 6, Ex. B, Kao Dep., at 16).  The job would have required Plaintiff to attend a 3-4 week training in Massachusetts.  (*Id*. at 17).  Plaintiff admitted that traveling is part of a consultant's job description (paper 6, Ex. A, Miller Dep., at 55), nevertheless, she declined to take the healthcare assignment because her child care responsibilities prevented her from attending the out of state training (*id*. at 61-62).

Hagnayeru Manickum was Defendant's resource manager in its commercial division.  In July 2004 Manickum contacted Kao because a client, Navigant, needed a database administrator and no one on Manickum's staff was qualified and available for the job at that time.  (Paper 6, Ex. G, Manickum Dep., at 14-17).  This billable assignment was to last approximately three months.  (*Id*. at 18).  Kao suggested that Manickum speak with Plaintiff.  Manickum spoke with Plaintiff and explained that the client needed someone to start on Friday July 16 or Monday July 19 and that she would need to be in the office between 7:30 and 8:00 every morning.  (Paper 6, Ex. G, Manickum Dep., at 17-18).  Manickum recalled that Plaintiff told him that she would not be available on Friday because she was having furniture delivered to her home that day and that the earliest she could report to work would be 9:30 am.[2]  (Paper 6, Ex.

---

[2]  Plaintiff wrote in a contemporaneous email to Kao that she had two appointments that were "medical in nature" that prevented her from starting on that Friday or Monday.  (Paper 6, Ex. E, Email from Miller to Kao, July 15, 2004, 02:09 PM).  The reason for Plaintiff's unavailability is not material.

G, Manickum Dep., at 18-19).  These terms were unacceptable to Navigant and the position was filled by a third party.  (*Id*. at 20-21).

Kao also referred Plaintiff to an internal project called Department of Defense ("DOD") consolidation.  Kao stated that Plaintiff's schedule prevented her from working on the DOD consolidation project because "people usually work 9 to 5 or something and [Plaintiff] said she could not come into the office 9 to 5[,] she [would] have to be in the office like 10 to 3. . . ." (Paper 6, Ex. B, Kao Dep., at 21).  Plaintiff admitted that she generally left the office by 3 pm, but that she would continue to work from home.  (Paper 6, Ex. A, Miller Dep., at 243).

Between 2002 and 2003, Defendant laid off over 450 employees as a cost-cutting measure.  (Paper 6, Att. E, Fox Decl. ¶ 2). Andrew Fox, Senior Director of Human Resources, explained that in 2004 Defendant "was forced to implement another round of layoffs in which [its] North American Operations was instructed to eliminate positions where revenue goals were not being met." (*Id*.).  In an effort to identify which employees to lay off, David Lavanty, Vice President, contacted Christopher Prestel, Director of Professional Services, and asked whether he had consultants who "did not have potential to be billable." (Paper 6, Ex. H, Prestel Dep., at 20-21).  Prestel focused on the consultants who were then on the bench.  He looked specifically at their availability in the past,

utilization rates, skill sets, and security clearances to determine their billable potential. (Paper 10, Ex. H, Prestel Dep., at 22).[3] Prestel performed this analysis on every consultant who was on the bench at that time. (*Id*. at 23). He determined that, based on these factors, Plaintiff had the least potential to be billable, and he recommended her for termination. (Paper 6, Ex. H, Prestel Dep., at 31). In its North American Operations, Defendant laid off 23 employees, including Plaintiff, around July 2004. (Paper 6, Att. E, Fox Decl. ¶ 2). On July 23, 2004, Defendant terminated Plaintiff's employment. Plaintiff was the only employee laid off in the metropolitan Washington area. Defendant subsequently hired four consultants in the Washington metropolitan area during August and September 2004. (Paper 9, Att., Defendant's Response to Interrogatories, Response No. 11). All four consultants had Top Secret security clearance or higher. (*Id*.).

After appropriately exhausting her administrative remedies, Plaintiff filed the present lawsuit on May 10, 2006, alleging four counts: Count I, discriminatory termination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"); Count II, retaliation in violation of Title VII; Count III, discriminatory termination in violation of 42 U.S.C. § 1981; and Count IV, retaliation in violation of 42 U.S.C.

---

[3] Defendant attached to its reply memorandum certain pages from Prestel's deposition that had been omitted from the excerpt attached to its motion for summary judgment.

§ 1981.  (Paper 1).  Plaintiff seeks a judgment that the conduct of Defendant was unlawful, a permanent injunction restraining Defendant from further engaging in discriminatory and retaliatory conduct, compensatory damages in the amount of $350,000, punitive damages in the amount of $350,000, and attorney's fees and costs. Discovery closed on October 30, 2006.  Defendant filed a motion for summary judgment on November 28, 2006.  (Paper 6).

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc*., 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. Analysis

There are two methods for proving intentional discrimination in employment: (1) through direct or indirect evidence of

intentional discrimination, or (2) through circumstantial evidence under the three-step, burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).[4]   Plaintiff has produced no direct evidence of discrimination, thus she must proceed under the *McDonnell Douglas* burden-shifting framework.   *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Under the *McDonnell Douglas* framework, the plaintiff first must establish a *prima facie* case of discrimination.   *See McDonnell Douglas Corp.*, 411 U.S. at 802.   Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged.   *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (citing *Tx. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).   If the defendant succeeds in doing so, that will rebut the presumption of discrimination raised by the plaintiff's *prima facie* case.   *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10).   The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true

---

    [4]   The *McDonnell Douglas* framework is used in both Title VII and § 1981 cases.   *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 189 (4th Cir. 2001).   Thus, the following analysis will apply equally to Plaintiff's claims under Title VII (Counts I and II) as to her claims under 42 U.S.C. § 1981 (Counts III and IV).

reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.   In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

**A.   Unlawful Termination (Counts I and III)**

To establish a *prima facie* case of discrimination in the reduction-in-force dismissal context, Plaintiff must show that: (1) she is a member of a protected class; (2) she was selected from a larger group for termination; (3) she was performing at a level substantially equivalent to the lowest level of those retained in the group; and (4) the process of selection produced a residual work force of persons in the group containing some unprotected persons who were performing at a level lower than that at which the plaintiff was performing.   *Bello v. Bank of Am. Corp.*, 320 F.Supp.2d 341, 347 (D.Md. 2004) (citing *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993)).

Plaintiff unquestionably satisfies the first and second elements of the *prima facie* case.   Plaintiff claims that she can also satisfy the third element because she was performing at a level substantially equivalent to other retained employees. Specifically, Plaintiff claims that Stephen Lalley and Lian Chen were similarly situated consultants that were retained "despite their prospects for being billable." (Paper 9, at 11).   Plaintiff

notes that at the time she was terminated she "had been employed with Sybase longer than Lalley and Chen, and her background investigation for top secret clearance was completed ten (10) days earlier on July 13, 2004." (*Id*.). Plaintiff's argument fails for several reasons.

First, in deciding whom to lay off, Prestel only considered consultants who were on the bench when Lavanty contacted him. (Paper 10, Ex. H, Prestel Dep., at 22, 36). Twelve consultants were on the bench at that time. (Paper 10, Att. B, Kao Supp. Decl. ¶ 2). Chen and Lalley, however, were not on the bench in June-July 2004, so neither was considered for lay off. (*Id*.).

Second, even if Lalley and Chen had been considered for lay off, Plaintiff cannot show that she was performing at a level substantially equivalent to them. Plaintiff admitted that she did not know what factors Defendant considered in making lay off decisions. (Paper 6, Ex. A, Miller Dep., at 113). Prestel stated that in considering which consultant to lay off, he looked at the consultant's availability, utilization rate, and security clearance. (Paper 6, Ex. H, Prestel Dep., at 21, 36; *id*. Ex. J, Response No. 10).

The first factor identified by Defendant was a consultant's availability for billable projects. Prestel explained that Defendant viewed "consultants['] willingness or availability to take positions we have offered them as a[n] indication of their

11

availability in the future." (Paper 6, Ex. H, Prestel Dep., at 32). Prestel considered the fact that Plaintiff had refused two or three assignments that had been offered to her. (Paper 6, Ex. H, Prestel Dep., at 34). Kao also cited Plaintiff's availability as problematic, stating she "found [Plaintiff's] schedule to be difficult because she said she could only be in the office from 10 a.m. to 3 p.m. [Kao] questioned [Plaintiff's] commitment to getting off the bench, given her rigid scheduling requirements." (Paper 6, Att. D, Kao Decl. ¶ 2). Kao stated that she relayed these concerns to Prestel when he inquired about the chances of finding billable work for Plaintiff. (*Id.*). Plaintiff has not presented any evidence that Lalley or Chen ever refused assignments. In fact, Lalley was offered, and accepted, the same opportunity to attend training for the healthcare assignment in Massachusetts that Plaintiff declined. (Paper 6, Ex. F, Lalley Dep., at 16).

The second factor identified by Defendant was a consultant's utilization rate. Plaintiff's utilization rate for 2003 was "subpar" at 74%. (Paper 6, Att. D, Kao Decl. ¶ 3). In contrast, Chen's utilization rate for 2003 was 81% and Lalley's was 80%. (Paper 6, Att. D, Kao Decl., Ex. A). Defendant also looked at the utilization rates for the two quarters immediately preceding Plaintiff's lay off. The utilization rates for Q2 2004 were: Plaintiff, 18%, Chen, 100%, and Lalley, 49%. For Q3 2004 the rates

were: Plaintiff, 0%, Chen, 107%, and Lalley, 106%.[5]   Kao
interpreted Plaintiff's utilization rates: "[b]ased on these
numbers, [Plaintiff] had been receiving full pay for more than
three months, yet had generated only 80 hours of billable work."
(*Id.*).   In contrast, Chen's rate "reflects that he was taking on
assignments and generating revenue" for Defendant. (Paper 6, Att.
D, Kao Decl. ¶ 4).   Lalley's "higher rate in 2004 is directly
attributable to his willingness to make himself more billable by
attending healthcare training . . . that Plaintiff declined to
attend.   As a result, he was billable when the layoff decisions
were made in July 2004." (*Id.* ¶ 5).

The final factor considered by Defendant was the consultant's
security clearance.   Although Defendant did not require consultants
to have an SCI clearance, its business in the intelligence
community, which required SCI clearance or higher, was stable while
its business in the DOD and civilian communities, which had lower
security clearance requirements, was declining.   (*Id.* at 28).
Thus, a consultant's security clearance would be an important
factor in her ability to take future assignments.   Plaintiff
acknowledged that higher security clearances made consultants more
marketable.   (Paper 6, Ex. A, Miller Dep., at 26-27).   Plaintiff

---

[5] Defendant makes clear that the 2004 Q3 utilization rate for
Plaintiff is based only on two months' work (paper 6, Att. D, Kao
Decl. ¶ 3).   It is not clear whether the 2004 Q3 utilization rates
for Chen and Lalley are based on their work for two months or for
the entire quarter.

alleges that her background investigation was completed prior to her lay off and, therefore, Defendant should have known her security clearance was imminent. Defendant has offered undisputed evidence that it did not know the status of the background check when it made the decision to lay her off. (Paper 6, Ex. H, Prestel Dep., at 29; *id* Ex. C, Andrews Dep., at 20). The information known to Prestel when he made the decision to lay off Plaintiff was that Plaintiff's security clearance application had been pending for approximately one year and that, in Andrews's opinion, its approval "was not imminent." (Paper 6, Ex. C, Andrews Dep., at 20). Plaintiff stated that neither Lalley nor Chen had the potential to receive Top Secret clearance. Even if this is true, all that it establishes is that at the time lay off decisions were made, Plaintiff, Chen, and Lalley had equivalent security clearances, but Lalley and Chen were more available and had higher utilization rates. Thus, Plaintiff was not performing at a substantially equivalent level as Chen or Lalley.

Finally, Plaintiff argues that she was more senior than Lalley or Chen, but there is no evidence that Defendant considered seniority in making its lay off decision. (Paper 6, Ex. H, Prestel Dep., at 21, 36).

It is Plaintiff's burden, on Defendant's motion for summary judgment, to show that she can establish each element of her *prima facie* case. *See McDonnell Douglas*, 411 U.S. at 802. Plaintiff has

not identified any retained employees who were performing at a substantially equivalent level as she at the time the lay off decision was made.  Plaintiff has failed to establish the third element of the *prima facie* case for wrongful termination in the reduction-in-force context.

Defendant argues that even if Plaintiff can make out a *prima facie* case, she cannot show that its proffered legitimate, non-discriminatory reason for terminating her employment, that there was a company wide reduction in force, is mere pretext.  Although Defendant did hire four consultants in August 2004, one of whom was an African American woman, it stated that this was not inconsistent with a company wide reduction in force because all four consultants had high security clearances and were immediately billable.  It is worth noting that Plaintiff has presented no evidence whatsoever that Defendant discriminated against her based on her race.  Because Plaintiff is unable to establish even a *prima facie* case of unlawful termination the court will not reach the question of pretext.  Defendant is entitled to summary judgment on Counts I and III.

**B.   Retaliation (Counts II and IV)**

Plaintiff alleges in Counts II and IV that Defendant terminated her employment in retaliation for the charge of

discrimination she filed against it in 1998, alleging discriminatory failure to promote.[6]

To establish a *prima facie* case of retaliation, Plaintiff must show: (1) that she engaged in a protected activity; (2) the employer acted adversely against her; and (3) the protected activity was causally connected to the adverse action. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (applying factors to Title VII claim); *Pulley v. KPMG Consulting, Inc.*, 348 F.Supp.2d 388 (D.Md. 2004) (applying factors to § 1981 claim), *aff'd*, 183 F.App'x 387 (2006).

Plaintiff is unable to show that her protected activity was causally connected to her termination for several reasons. First, Prestel did not know that Plaintiff had filed the 1998 charge of discrimination when he made the decision to lay her off. (Paper 6, Ex. H, Prestel Dep., at 40). "Knowledge of a charge is essential to a retaliation claim." *Causey v. Balog*, 162 F.3d 795, 803-04 (4th Cir. 1998) (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the *prima facie* case")). Plaintiff's only response to Defendant's evidence is that

---

[6] The Montgomery County Human Relations Commissions issued a no-cause finding on August 19, 2002. Plaintiff appealed that decision and the appeal was denied on April 17, 2003. (Paper 6, Ex. A, Miller Dep., at 17).

"Prestel's knowledge notwithstanding, it was common knowledge that Miller had previously filed a discrimination claim against Sybase. . . . A reasonable jury could disbelieve Prestel and conclude that he knew about Miller's prior discrimination claim well before he decided to terminate her." (Paper 9, at 17). Weighing the evidence and judging the credibility of witnesses are impermissible functions for the court on summary judgment. *See Reeves*, 530 U.S. at 150-51. Plaintiff has offered no evidence that Prestel knew of her charge of discrimination prior to making the decision to lay her off. The uncontested evidence shows that the decision maker lacked knowledge of Plaintiff's protected activity, thus Plaintiff's claim of retaliation cannot stand.

Second, even if there was some institutional knowledge of her charge of discrimination, as Plaintiff claims (paper 6, Ex. A, Miller Dep., at 21), the length of time between her charge of discrimination and the adverse activity, six years, is simply too long to support an inference of a causal connection. *See Dowe*, 145 F.3d at 657 ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two.").

Third, from 1998 to 2003, while this matter was pending before the Human Relations Commission, Plaintiff received multiple raises and a promotion. (Paper 6, Ex. A, Miller Dep., at 18). This

evidence tends to negate an inference of retaliation.  Plaintiff also received a raise in January 2004, after the final adjudication of her claim in April 2003.  (*Id*. at 15).  This evidence tends to refute Plaintiff's argument that Defendant retaliated against her at the first opportunity after her protected activity concluded (*see* paper 9, at 18).

In sum, Plaintiff has offered no evidence, circumstantial or otherwise, that shows that her termination was in retaliation for her prior protected activity.  Defendant is entitled to summary judgment on Counts II and IV.

## IV.  Conclusion

For the foregoing reasons Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56 will be granted.  A separate Order will follow.


                          _____/s/_____
                          DEBORAH K. CHASANOW
                          United States District Judge